STATE OF MAINE                                              DISTRICT COURT

Cumberland, ss.


TODD ENO and SUSAN ENO

                        Plaintiffs

            v.                                   Docket No. WESDC-CV-14-48

DILIP CHAKRAVARTY and MITALI CHAKRAVARTY

                        Defendants

_____


TODD ENO, SUSAN ENO, STEPHEN ENO, MICHAEL ENO
and JOSEPH ENO

                        Plaintiffs

            v.                                   Docket No. WESDC-CV-14-49

DILIP CHAKRAVARTY and MITALI CHAKRAVARTY

                        Defendants

                        DECISION AND JUDGMENT

        Trial in these consolidated civil actions occurred June 10, 2015, with Plaintiffs Todd and

Susan Eno ["the Enos"] and Defendants Dilip and Mitali Chakravarty ["the Chakravartys"]

present with counsel. The parties presented evidence, and the court thereafter took the cases

under advisement. Based on the entire record, the court adopts the following findings of fact and

conclusions of law and renders judgment as set forth below.

        1.      Jurisdiction and venue are proper given that the cases involve claims arising in

Brunswick, Maine under the laws of the State of Maine. Plaintiffs are Maine residents and

Defendants are former Maine residents who now live in New Hampshire.

                                            1

2. The Chakravartys resided in the single family residence located at 25 Arrowhead Drive, Brunswick, from 1998, when they purchased the home, until 2012. They decided to keep 25 Arrowhead Drive as a rental property and for possible future use as a retirement home.

3. During 2012 to 2013, they rented the property to a tenant who eventually moved out. At some point during 2013, the Chakravartys became aware of mold problems in the residence that necessitated a major interior renovation, including extensive interior painting and replacement of virtually all carpeting in the home, costing thousands of dollars.

4. While the renovations were in progress, the Chakravartys arranged for Laurie Leader, who runs a property management and rental agency, to locate a new tenant for the property. During the fall of 2013, she took several potential tenants on visits to the home, while renovations were in process. At no time during any of those visits—or walk-throughs as they are called—did she note any fleas, bedbugs, ticks or other insect infestations. Admittedly, the walk-throughs were not tantamount to full home inspections, and lasted 5-10 minutes each.

5. Meanwhile, the Enos were in the process of selling their home, and they decided to rent to give themselves adequate time to look for a home to purchase. Ms. Leader took them on two brief walk-throughs of the 25 Arrowhead Drive home, the first lasting 20 minutes and occurring while the interior was being painted, and the second lasting about 10 minutes and occurring while the carpeting was being installed. The Enos did not notice any insect infestations or any other particular problems with the home during either walk-through.

6. At some point, perhaps during the second walk-through, Susan Eno and Laurie Leader compiled and initialed a list of items needing repair or attention that the Enos deemed to need attention, none related to insects, and the Chakravartys took care of the items. Defs. Ex. 2.

7. The Enos and the Chakravartys executed a Residential Lease for the home for the period December 7, 2013 through June 30, 2014, for $1,200 per month, payable the first day of

2

each month. Pls. Ex. 1.[1] The Lease was drafted by the Chakravartys and does not appear to have been negotiated to any significant degree, so ambiguous terms are to be construed against them. *See Barrett v. McDonald Investments, Inc.*, 2005 ME 43, ¶17, 870 A.2d 146, 150, *citing* 11 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 32:12 at 471-72 (4th ed. 1999) ("Since the language is presumptively within the control of the party drafting the agreement, it is a generally accepted principle that any ambiguity in that language will be interpreted against the drafter.").

8.     Section 1 of the Lease, titled TERMS, contains a provision to the effect that, if the Enos moved from the property before the expiration of the lease term, they would remain liable for rent until the end of the lease term or until a "lessor-approved lessee" began paying rent, whichever occurred earlier. Section 6 of the Lease contains a provision in which the Enos as tenants "acknowledge[] that they have examined the Premises and that said Premises . . . are all clean and in good condition except as may be acknowledged elsewhere" in the Lease. Nothing else in the Lease indicates anything to the contrary.

9.     According to Section 2 of the Lease, titled PAYMENTS, at the time of executing the Lease the Enos paid the Chakravartys a total of $2,729, reflecting $929 for prorated December rent; another $1,200 for a security deposit, and "last month's rent of $1,200 minus a security deposit of $600." The meaning of the quoted clause is unexplained in the evidence—it appears that the Chakravartys may have credited half of the security deposit toward the last month's rent, but this is by no means certain.

10.     The Enos and their three sons moved into the 25 Arrowhead Drive home on the weekend of December 7-8, 2013. As they were moving in, a Direct TV technician who had come to install equipment told Susan Eno that he had been bitten by fleas while in the home.

---

[1]  This and similar references are to Plaintiffs' exhibits. References to Defs. Ex. are to Defendants' exhibits.

11.     Late on the afternoon of Sunday, December 8, the Chakravartys sent the Enos an e-mail message welcoming the Enos to the home and expressing the hope to meet in person soon. Pls. Ex. 2. Susan Eno responded several hours later, at 8:01 p.m., with an e-mail message to the Chakravartys stating that "We do have a concern that has come up already. The house seems to have fleas no doubt left over from the previous ten[ants]," and noting that the Direct TV technician and one of her sons had already been bitten. The message concluded, "Before I bring my cat over I would really like to have this issue addressed." Pls. Ex. 2. Dilip Chakravarty responded 47 minutes later with an e-mail message indicating "I have already communicated this to the pest control guy. I hope to communicate with him tomorrow to take care of this matter." Pls. Ex. 2.

12.     True to his word, at 8:44 a.m. Monday, December 9, Mr. Chakravarty sent Ms. Eno an e-mail message giving her the name and telephone number of the pest control operator whom he had contacted regarding the flea problem, and indicating that the operator would be contacting her "to set up a time when he can go in and take care of the fleas." Pls. Ex. 2.

13.     There is no doubt that there was an infestation of fleas in the home, and also that there were bedbugs, at least during the first week or two of the Enos' time there. However, the provenance of the fleas and bedbugs is a mystery. The Enos did not bring the infestation with them. One explanation is the one Susan Eno gave--that the fleas and bedbugs remained after the previous tenant had left. However, the fact that Ms. Leader came to the house numerous times with prospective tenants and noted nothing suggests that, if there were any fleas and bedbugs in the home, no one seems to have noticed them until the Enos' arrival. Also, given the thousands of dollars the Chakravartys spent during the fall of 2013 to renovate the property for their next tenants, it seems likely that, had they noticed or been made aware of any flea or

4

bedbug infestation, they would have paid to have the place fumigated or otherwise treated, before installing carpet and completing the renovations.

14. In any event, the "pest control guy" contacted by Mr. Chakravarty was Matthew Allen, owner and operator of a local pest control service called Bug Busterzzz. Mr. Allen came to 25 Arrowhead Drive on Tuesday December 10, and treated the premises for fleas.

15. Four days later, on the morning of Saturday, December 14, Ms. Eno and Mr. Chakravarty evidently had a telephone conversation, which he summarized in an e-mail message sent at 10:01 a.m. His message described in some detail the course of treatment that he had arranged for Bug Busterzzz to provide, and the need for her to vacuum floors 1-2 times daily, and also encouraged her to contact him or Mr. Allen with any concerns. Pls. Ex. 3. Ms. Eno replied to the message at 1:43 p.m. that afternoon, indicating that she had found what she thought were ticks in the home and had already told Mr. Allen, who responded that she likely was seeing bedbugs. Her reply message voiced dismay at the severity of the flea infestation.

16. That night, Ms. Eno sent Mr. Chakravarty another message indicating that she had counted three bedbugs and assumed there were many more. He responded by assuring her that he had authorized Bug Busterzzz to "take care of these issues fully." Pl. Ex. 4.

17. Matthew Allen returned to 25 Arrowhead Drive on Wednesday, December 18, to give the home a second treatment for fleas and an initial treatment for bedbugs, which he confirmed were in residence. In an invoice to Mr. Chakravarty dated the same day, Mr. Allen indicated that he planned two more treatments at two-week intervals, at a total cost to the Chakravartys of $900.

18. Meanwhile, everyone in the Eno family was suffering the effects of a flea and bedbug infestation, including multiple bites and the resulting itching and scratching, and also the inconvenience of having to take steps such as repeated vacuuming to combat the infestation. *See*

Pl. Ex. 5-16 (photographs). As Ms. Eno put it, "life shut down." The Enos could not have anyone visit the house for obvious reasons, and their days and nights were consumed with staving off the fleas and bedbugs. The Enos also had concern over the odor and potential health effects of "chemicals" used by Bug Busterzzz in treating the flea infestation and eliminating bedbugs.

19.     Susan Eno's discomfort and anxiety about the situation reached the point at which she scheduled a doctor's visit for December 19. Quite understandably, she reported multiple insect bites and increased anxiety. *See* Pls. Ex. 17.

20.     At 5:40 a.m. the same day, Ms. Eno sent Mr. Chakravarty a message confirming that Bug Busterzzz had returned to the residence for another treatment, but also saying the "situation is unlivable at this time." She said that the parties needed to discuss the Enos being "relocated" and the costs associated with the insect infestation, as well as the Enos' deposit and rent. She also said she had retained a lawyer and had contacted the state Center for Disease Control. Her message closed with the observation, "I still find it hard to believe that no worker that you had in this house prior to us moving in was aware of this issue." Pl. Ex. 4.

21.     Mr. Chakravarty responded later the morning of December 19, with a message saying that his lawyer had advised that his actions were in compliance with law, and asking Ms. Eno to "please be patient." His message also said that the previous tenant had not informed the Chakravartys of any fleas or bedbugs. Pl. Ex. 4.

22.     On December 22, 2013, the Enos moved out of the 25 Arrowhead Drive home, as a result of not being able or willing to live any longer with the insect infestation at the home, and also based on their concern about the health effects of the substances applied in the course of Bug Busterzzz's treatment regimen. They left their furniture behind, because they did not want to bring any insects with them.

6

23. The Enos were obviously justified in moving out, at least temporarily, as of December 22, 2013, based on the severity of the insect infestation and the resulting discomfort and inconvenience to the entire Eno family. Because their furniture remained there, the Enos' departure did not vacate the premises for purposes of the Lease.

24. The evidence does not indicate any particular safety issues or adverse health effects resulting from any chemicals or other substances used in treating the premises.

25. The evidence was unclear as to when, before they moved out on the 22d, the Enos made their decision. In any event, it is clear that the treatments by Bug Busterzzz on December 10 and 18 had not rid the property of insects entirely as of December 22, 2013.

26. On the other hand, the pest control measures that Bug Busterzzz and Mr. Allen were implementing at 25 Arrowhead Drive were standard for the pest control industry, although, as Mr. Allen testified, every pest control operator has its own methods and approaches.

27. At 12:26 p.m. December 26, 2013, Ms. Eno sent the Chakravartys an e-mail message indicating that, at the recommendation of her primary care physician and a representative of "the cdc" (presumably the federal or Maine Centers for Disease Control), the Enos had moved out. Her message expressed the Enos' willingness "to work with you, but it is not humane staying there at present." The message said as well, "This next month's rent is going to the new place that we are staying. We are incurring multiple bills with doctors appts, vet fees, [etc.] not to mention the hardship this has done mentally and physically to us and especially on the children. We[']re asking you to meet us halfway on this issue or we will have to go to court. Something I'm sure neither of us wants to do." Pls. Ex 18.

28. Within a half hour, Mr. Chakravarty replied in an e-mail message indicating, "We are willing to talk to you," and proposing a meeting on Saturday, December 28, 2013. Pls. Ex 18. There ensued a series of messages back and forth over the afternoon of December 26,

7

during which Mr. Chakravarty proposed a meeting at the 25 Arrowhead Drive house, to which Ms. Eno demurred on the ground that she did not want to be exposed to fleas again. Ultimately, it was agreed to meet at the Dunkin Donuts store at Cooks Corner, Brunswick.

29.     That meeting occurred as scheduled on December 28, but it did not produce any agreement going forward. Though the details of the meeting were not set forth in detail, the court infers that the Enos, having been forced to leave the home, were looking for the Chakravartys to acknowledge the problem in a financial way, such as by reducing or forgiving rent, whereas the Chakravartys, no doubt mindful of the cost of the pest control measures they had commissioned, did not offer to suspend rent or otherwise offer any financial assistance or offset to the Enos.

30.     Although the evidence is vague on detail, it appears that at the December 28 meeting, the Enos notified the Chakravartys that they were terminating their tenancy under the Lease. *See* Pls. Ex. 20 (referring to "meeting on 12/28/2013 when [Plaintiffs] expressed a desire to terminate the lease").

31.     Also at the December 28, 2013 meeting, or soon thereafter, the Enos advised the Chakravartys that they would be vacating the premises, although, as discussed further below, it is not clear that the Chakravartys understood precisely when the Enos would be vacating the premises.

32.     On December 30, the Enos consulted with attorney Feldman regarding their legal rights and options. *See* Pls. Ex. 24.

33.     On December 30 and 31, Mr. Chakravarty sent Ms. Eno messages indicating that he would be showing the house to prospective tenants on January 1 and January 4, 2014.

34.     At some point in late December, perhaps on December 28, the day of the Dunkin Donuts meeting, the Chakravartys came to the home, which had been vacated by the Enos,

8

although their furniture remained there. The Chakravartys stayed several hours and did not note any insect issues. Their son tested the carpets for fleas and bedbugs by sitting on the floor for a long time, and did not experience any bites or other signs of the insects.

35. On Monday, January 6, 2014, Mr. Chakravarty sent Ms. Eno an e-mail message indicating that he had located a satisfactory new tenant for the property and was "relieving you from the lease on my house. Please consider this as a one month's notice starting today. I will return the security deposit of one month's rent when you vacate the house." Pl. Ex. 20. The plain purpose of Mr. Chakravarty's January 6 e-mail was to give the Enos notice that the Chakravartys were agreeing to the termination of the Enos' tenancy effective one month from the date of the message. It does not appear that the Enos responded to this e-mail.

36. On January 14, 2014, Matthew Allen sent Mr. Chakravarty what he called an "update on 25 Arrowhead Drive," in which he indicated that Bug Busterzzz had treated "all rooms, beds, furniture, baseboards [etc.]" in the home and had found several bed bugs during the initial treatment December 18. He went on to say that a second treatment was performed January 8, 2014, with no live bed bugs found and the flea problem "all cleared up." His update closed with an indication that a third treatment for bed bugs would be performed January 23.

37. At some point during these events, the Enos' report of an insect infestation came to the attention of Ms. Leader, and as a result, on her own initiative, she made a report to the local health inspector about a "possible" infestation.

38. On or about January 19, 2014, the Enos vacated the premises by moving out all of their furniture and other belongings from the 25 Arrowhead Drive property.

39. On January 31, 2014, Mr. Chakravarty sent an e-mail message to Susan Eno indicating that the Chakravartys would be at the Arrowhead Drive residence the next day, and asking that the Enos "please leave the house keys and the garage door openers in the kitchen

9

central island drawers when you vacate the house." Based on the reference to "when you vacate the house," it appears that the Chakravartys did not know that the Enos had vacated the home as of January 19. *See* Defs. Ex. 3.

40. The Chakravartys' new tenant moved in to the 25 Arrowhead Drive property as of February 21, 2014, and the Chakravartys did not, and do not, look to the Enos for any rent after that date. The Chakravartys' lease with the new tenant is dated and was signed as of February 1, 2014. *See* Defs. Ex. 4. Based on all signatures on that lease being dated as of February 1, the court infers that the new tenant and the Chakravartys met at the property that day and signed the new lease then and there.

41. On February 20, 2014, the Enos' attorney, Michael Feldman, sent a letter to the Chakravartys' attorney, Kristina Kurlanski, notifying her of the Enos' claims regarding the Chakravartys' failure to account for, or to return, their security deposit within 30 days as required by law, *see* 14 M.R.S. § 6033, and also their claim to recover their last month's rent payment based on their departure from the house within two weeks of moving in, due to the insect infestation. *See* Pl. Ex. 23.

42. Attorney Kurlanski responded in a letter dated February 26, 2014, refuting the contentions in attorney Feldman's letter and noting also that the Chakravartys' new tenant had moved in only as of February 21, 2014, and expressing the Chakravartys' willingness to forgo claiming rent for part or all of February in an effort to resolve the dispute. *See* Pl. Ex. 22.

43. With her February 26, 2014 letter, attorney Kurlanski sent attorney Feldman a breakdown of the amounts that the Chakravartys were withholding from the Enos' $1,200 security deposit. The total deduction was $836, consisting of cleaning, fuel and electricity costs for the period during the Enos' tenancy, leaving $364 to be refunded to the Enos.

44.     However, the $364 refund was not sent to the Enos via attorney Feldman until March 4, 2014, when attorney Kurlanski forwarded the Chakravartys' check in that amount with a letter of that date.

45.     On March 24, 2014, attorney Feldman commenced these actions on behalf of the Enos.

46.     The three-count Complaint in the case docketed as WESDC-CV-14-48 asserts a claim in Count I for violation of the Maine security deposit law, *see* 14 M.R.S. § 6034; a common law breach of contract claim for return of the security deposit in Count II, and a claim for return of their first and last months' rent, moving costs and other damages under the implied warranty of habitability statute, *see* 14 M.R.S. § 6021.

47.     The single count Complaint in the case docketed as WESDC-CV-14-49 asserts a common law personal injury claim on behalf of the Enos and their children, alleging negligence on the part of the Chakravartys.

48.     The Chakravartys through attorney Kurlanski responded to both Complaints with motions to dismiss pursuant to M.R. Civ. P. 12(b)(6). After both motions were denied, the Chakravartys filed answers, and, in the case docketed as WESDC-CV-14-48, a counterclaim seeking a declaration that they are entitled to retain all of the amounts paid to them, and also seeking damages against the Enos.

49.     By agreement of the parties, the cases were consolidated for all purposes in April 2014, and thereafter the parties engaged in discovery. Based on the parties' and the District Court's projection that trial of the cases would take more than two hours, the cases were assigned to the Superior Court for trial.

*The Enos' Negligence Claim in WESDC-CV-14-49*

11

50. The Enos' common law negligence claim for damages due to personal injury and emotional distress requires a threshold determination of a residential landlord's duty in the circumstances presented. The Maine Legislature has enacted statutes defining a residential landlord's duty when the rental premises become uninhabitable, *see* 14 M.R.S. § 6021, and when a bedbug infestation is discovered at the rental premises, *see* 14 M.R.S. § 6021-A. Thus, even when a tenant's claim is not expressly brought under these statutes, as is the case in WESDC-CV-14-49, the statutes remain relevant to the definition of a residential landlord's duty when a flea and bedbug infestation renders the rental premises at least temporarily uninhabitable, as was the case here.

51. At common law, absent contrary lease provisions, a residential landlord's duty of care likely does not extend to dealing with insect infestations in areas under the tenant's exclusive control, unless the landlord knew or had reason to know of the infestation before the tenant took exclusive control of the premises. *See Chiu v. City of Portland*, 2002 ME 8, ¶¶11-12, 788 A.2d 183, 187, *citing Nichols v. Marsden*, 483 A.2d 341, 343 (Me. 1984). Considering the Legislature's declarations of public policy in Maine concerning a residential landlord's duties in sections 6021 and 6021-A, it might be concluded, with regard to an insect infestation affecting a tenant's use and quiet enjoyment of rental premises, that a residential landlord has a duty not to rent premises that the landlord knows or has reason to know are infested, and further, if such an infestation at rental premises comes to the landlord's attention, a duty to take reasonably prompt, safe and effective measures to eliminate the infestation.

52. However, even if the common law rule relieving a residential landlord of responsibility for conditions in areas of the premises under the tenant's exclusive control were deemed to apply, it does not relieve the Chakravartys of responsibility for a flea infestation that was reported on the day the Enos finished moving in. In other words, because the flea

12

infestation did not arise after the Enos took exclusive control of the home, the responsibility to deal with the flea infestation did not shift from the Chakravartys to the Enos.

53. The primary contested factual issue in WESDC-CV-14-49 is whether the Chakravartys breached their duty of care. On this issue, under the common law of negligence, the Enos have the burden of persuasion by a preponderance of the evidence.

54. With regard to the landlord's duty not to rent premises that the landlord knows or has reason to know are infested, there is simply no evidence, beyond the fact of the existence and severity of the infestation, that the Chakravartys knew or had reason to know of it prior to renting the premises to the Enos. Were the record silent regarding the period before the Enos moved in on the weekend of December 7-8, 2013, it might be possible to infer, based on the severity of the flea infestation alone, that the Chakravartys must have known about it. However, the record is not silent.

55. Ms. Leader and various painters and carpet installers were on premises repeatedly in the weeks and days before the Enos arrived. Ms. Leader's report to the health inspector in January or February 2014 after learning of the Enos' experience compels the inference that, had she become aware of an insect infestation in the home before the Enos arrived, she would have notified the Chakravartys and the health inspector at that time. There is no evidence that any of the many people who were inside the home before the Enos moved in—the Chakravartys, Ms. Leader, the prospective tenants she brought to the home, the painters and carpet installers, the Enos themselves—noticed any fleas or bedbugs, or any infestation of any kind. Thus, there is no way to avoid the conclusion that the Enos have not proved that the Chakravartys knew, or had reason to know, of any insect infestation before Susan Eno notified them of fleas on December 8, 2013.

56.     As to the Chakravartys' duty to take reasonably prompt, safe and effective measures to eliminate the infestation after being made aware of it, the evidence indicates that Mr. Chakravarty learned of the flea infestation the evening of Sunday, December 8, and before 9 a.m. the next morning had arranged for Bug Busterzzz to treat the premises, which treatment occurred two days after the Chakravartys were notified. Although not directly applicable to this claim, the Maine statute on bedbug infestation, *see* 14 M.R.S. § 6021-A, affords insight into how quickly a landlord should be expected to respond to a report of an insect infestation. The Chakravartys' virtually immediate response to being notified of the problem was well within any standard of reasonableness, including the section 6021-A time limits for a landlord's response to a bedbug infestation.

57.     As to the duty to take safe and effective measures, although the Bug Busterzzz treatment regimen did not eliminate the infestation immediately or even within ten or twelve days, the course of treatment was standard in the pest control industry for such infestations, and it significantly reduced—or even eliminated—the flea and bedbug problem within days of when the Enos moved out on December 22. The Chakravartys and their son were in the house December 28 and did not experience any problems. Further, Mr. Chakravarty took prospective tenants through the home during the first four days of January, and one of the prospects agreed to rent the property beginning in February. These facts help establish that the infestation was well under control, if not eliminated, as of late December and the beginning of January.

58.     Although the Enos noted the presence of "chemicals" during the treatment, there is no evidence that the treatment itself resulted in any health hazard or adverse health effects.

59.     For these reasons, the court finds and concludes that the Enos have not proved that the Chakravartys breached their duty to take reasonably prompt, safe and effective measures to eliminate the insect infestation after being on notice of the infestation.

60. Accordingly, judgment will be granted to the Defendants, Dilip and Mitali Chakravarty, in the case docketed as WESDC-CV-49.

*The Claims and Counterclaim in WESDC-CV-48*

61. The Enos' claim in Count I of their Complaint in WESDC-CV-14-48 alleges that the Chakravartys violated the Maine law regarding residential security deposits by failing to provide an itemized statement of the amounts being withheld from the security deposit and failing to refund the balance of the security deposit within 30 days of when the Enos vacated the premises. *See* 14 M.R.S. § 6033(2). Section 6033 provides that a written residential lease may allow the landlord up to 30 days to account for the security deposit, and the Lease in this case gives the Chakravartys the full 30 days.

62. The parties disagree on when the 30 days began to run. The Enos say it began no later than January 19, 2014, when they vacated the premises. The Chakravartys say it began February 21, 2014, when their new tenant moved in.

63. To some extent, the determination of the 30-day period depends on whether the Enos had the right to terminate the lease and vacate the premises effective January 19, 2014. If they did, then the 30-day period arguably began to run as of that date. However, the court concludes that they did not have the right to terminate the Lease as a result of the insect infestation. This is certainly not to say that they were not justified in moving out December 22, 2013, but there is a very large difference between moving out temporarily while the premises were being treated and terminating the Lease. Nothing in the Lease itself, or in the Maine statutes on bedbugs and the implied warranty of habitability, or in the common law gave the Enos the right to terminate the Lease altogether, at least while the Chakravartys and Bug Busterzzz were taking reasonable steps—well within the time frames defined by the bedbug statute—to eliminate the infestation.

64. However, the Chakravartys agreed to relieve the Enos of their obligations under the Lease by means of Mr. Chakravarty's e-mail message of January 6, 2014, which gave the Enos "one month's notice starting today." Pl. Ex. 20. The Enos evidently never responded to that e-mail message, and there is no writing before attorney Feldman's February 20, 2014 letter, Pl. Ex. 23, notifying the Chakravartys about the Enos vacating the premises as of January 19, 2014.

65. Moreover, Mr. Chakravarty's message of January 31, 2014, informing the Enos that the Chakravartys would be "visiting" the property on the next day, and asking the Enos to leave the keys when they vacated the house, confirms that, as of January 31, the Chakravartys were operating on the understanding that the Enos may not have vacated the home and had until February 6, 2014—a month after the "one month's notice" was given—to do so.

66. It may be that the Enos had told the Chakravartys at the December 28 meeting that they planned to vacate the property by mid-January, but Mr. Chakravarty's January 6 e-mail message plainly shows that the message did not get through. Thus, the court cannot find that the Chakravartys had any advance knowledge that the Enos would be vacating before the one-month deadline Mr. Chakravarty set in his January 6 e-mail message.

67. For all of these reasons, the court disagrees with the Enos that the Chakravartys' 30-day deadline began to run January 19, 2014. At the earliest, it began to run when the Chakravartys knew or should have known that the Enos had vacated. That day, based on the same January 31 e-mail message, was February 1, 2014. When the Chakravartys came to the home that day, they knew or certainly had reason to know that the Enos had vacated the premises. In fact, as noted above, their lease with their new tenant was signed and dated as of February 1, 2014, providing further support for the view that the 30-day deadline for returning the Enos' security deposit began running as of February 1, 2014.

68.     Were this a tenancy at will, by statute the Chakravartys' deadline would have been triggered by "the termination of the tenancy or the surrender and acceptance of the premises, *whichever occurs later*." 14 M.R.S. § 6033(2)(B) (emphasis added). The later date in this case was February 6, 2014—the date when the one-month notice contained in Mr. Chakravarty's January 31 e-mail message expired, so the 30-day deadline would have run from February 6 to March 8, 2014.

69.     However, because this was not a tenancy at will, the deadline for return of the security deposit was triggered by the terms of the Lease, *see* 14 M.R.S. § 6033(2)(A), and section 3 of the Lease says the deposit will be returned within 30 days "after the Premises have been completely vacated," not within 30 days of when the Lease is terminated. As noted above, the deadline cannot be deemed to have started to run before the Chakravartys knew or should have known that the Enos had vacated the property. For all of these reasons, the court finds and concludes that the 30-day period for return of the Enos' deposit began February 1, 2014 and ended on March 2, 2014.

70.     The security deposit law requires the landlord to provide the tenant with the itemized accounting and any full or partial refund within the 30-day period. 14 M.R.S. § 6033(2). Here, the itemized statement was provided within the 30-day period, but the refund was not. The refund came with attorney Kurlanski's letter of March 4, 2014, two days late.

71.     The Enos dispute the Chakravartys' right to withhold all but $364 of the security deposit, but the court need not address this issue in detail, because the Chakravartys' failure to provide the $364 refund within the statutory 30-day deadline means that they have forfeited the right to withhold any of the security deposit. The effect of this forfeiture is discussed further below in the context of the Chakravartys' counterclaim.

72.     The remaining issue regarding Count I of the Complaint in WESDC-CV-14-48 is whether the Enos are entitled to double damages and attorney fees for wrongful withholding of the security deposit under 14 M.R.S. § 6034. That section reads, in pertinent part:

> If the landlord fails to return the security deposit and provide the itemized statement within the time periods in section 6033, the tenant shall give notice to the landlord of the tenant's intention to bring a legal action no less than 7 days prior to commencing the action. If the landlord fails to return the entire security deposit within the 7-day period, it is presumed that the landlord is wrongfully retaining the security deposit.

14 M.R.S. § 6034(1).

73.     Here, the Enos gave the above-mentioned notice by means of attorney Feldman's February 20, 2014 letter. *See* Pl. Ex. 23. However, that notice was given while the 30-day period was still running. In fact, the 7-day notice purportedly given by the letter expired before the 30-day period expired. Although the notice could be deemed void as a result of being prematurely sent, the better view is that it was insufficient to trigger the statutory presumption of wrongful retention after 7 days. Still, even without the presumption, the burden is on the landlord to prove that the landlord's withholding of part or all of the security deposit was not wrongful. *See* 14 M.R.S. § 6034(3).

74.     Although they forfeited the right to withhold the deposit, the Chakravartys have proved that they were entitled to withhold all but $364 of the Enos' security deposit. The $836 withheld represents the cost of fuel, electricity and cleaning, all of which were the Enos' responsibility under the Lease.

75.     On the other hand, the Chakravartys have not proved they did not wrongfully withhold the $364 for purposes of section 6034(3), so the Enos are entitled to double damages in that amount, totaling $728, as well as damages for the entire amount of the security deposit on Count I of their Complaint in WESDC-CV-14-48.

76. The Enos are also entitled to an award of attorney fees on Count I, under the provisions of section 6034. Attorneys fees are discussed further below.

77. Count II of the Complaint presents a breach of contract claim regarding return of the security deposit. It is based on Mr. Chakravarty's promise in his January 6, 2014 e-mail message that "I will return the security deposit of one month's rent when you vacate the house." Pl. Ex. 20. The Enos claim that because they vacated January 19, 2014, the Chakravartys breached the promise by not returning the entire security deposit on or soon after that day.

78. Read literally, the pertinent part of Mr. Chakravarty's January 6 message might be open to be interpreted as the Enos do—that he on behalf of himself and his wife agreed to return the entire security deposit as of whenever the Enos vacated the property, thereby waiving the Chakravartys' right under the Lease to withhold some or all of the security deposit on the grounds specified in the Lease, and also waiving the 30-day period that the Lease provided for return of the deposit. However, such a reading is inconsistent with the reality.

79. Waiver is the voluntary and intentional relinquishment of a known right, *see Interstate Industrial Uniform Rental Service, Inc. v. Couri Pontiac, Inc.*, 355 A.2d 913, 919 (Me. 1976). There is no basis in the evidence for a finding or inference that the Chakravartys' reference to returning the deposit was intended to give up the Chakravartys' right to make deductions from the Enos' security deposit for damage or other reasons permitted by the Lease.

80. Because the $836 deduction that the Chakravartys took was appropriate, the Chakravartys did not breach the Lease in refunding only $364 to the Enos. As noted above, however, the Chakravartys delivered the $364 refund 32 days after being notified that the Enos had vacated, rather than within the 30 days required by the Lease, and the two-day delay was a breach of the Lease, though the delay was not shown to have caused any damage to the Enos. Accordingly, judgment will be rendered for the Enos on Count II, but only for $364.

81. Count III of the Complaint in WESDC-CV-14-48 is a claim for both the first and last months' rent, and it cites to the implied warranty of habitability statute, 14 M.R.S. § 6021.

82. The Enos claim to be entitled to recover the entire amount paid for rent based on the premises being infested from the outset and on their having moved out after only two weeks, as well as their moving costs and other damages. In response, the Chakravartys claim that they are entitled to apply the Enos' prorated first month's rent payment to rent due for December 2013, and to apply the Enos' payment for the last month's rent to rent due for January 2014.

83. The outcome of Count III depends on whether, either under the Lease or under the implied warranty of habitability statute cited in Count III, 14 M.R.S. § 6021, the Enos were entitled to suspend or terminate their monthly rent obligation for all or part of the months of December 2013 and January 2015.

84. The problem with the Enos' argument is that neither the lease nor the law as written allows the tenant to withhold rent unless the landlord has failed to take effective corrective measures.

85. As noted above, the court sees no basis in the lease or the implied warranty statute that entitled them to terminate the Lease altogether. The Lease provides for early termination by the lessee in the event of partial or total destruction of the premises—not an issue here. The implied warranty of habitability statute allows rent to be withheld only when the landlord is failing or refusing to take steps to rectify the problem affecting habitability, *see* 14 M.R.S. § 6021, and for that matter, the bedbug statute reads likewise.

86. Because the Chakravartys took prompt, safe and ultimately effective measures to deal with the infestation, there was no basis in the Lease or otherwise in law, for the Enos to terminate the tenancy or to withhold or suspend rent. Accordingly, their rental obligation continued through the January 19 date when they vacated the property, at least until February 1,

20

2014, when the Chakravartys executed a lease with their new tenant. The Chakravartys were entitled to apply the prepaid first month's prorated rent to the December 2013 rent and to apply the prepaid last month's rent to the rent due for January 2014. Judgment on Count III of the Complaint in WESDC-CV-14-48 therefore will be entered for the Chakravartys.

87. The Chakravartys' counterclaim appears to seek confirmation of their actions and also seeks damages. As to the former request, in the nature of declaratory relief, the foregoing findings and conclusions speak for themselves. The court confirms some but not all of the Chakravartys' actions. As to damages, the Chakravartys have not requested or proved damages, beyond the amounts they have retained from the Enos' prepaid rent and security deposit payments.

88. One point that merits some discussion is the $836 that the Chakravartys withheld from the security deposit. The court has found that they were justified in doing so for purposes of the Enos' damages claim, but has also found that they have forfeited the right to withhold any of the security deposit because they returned the $364 refund late. The question becomes whether the Chakravartys can, in effect, undo the forfeiture by recovering the $836 on their counterclaim for the fuel, electric and cleaning expenses that make up the amount withheld.

89. In *Lyle v. Mangar,* the Law Court held that nothing in the security deposit law prevents a landlord who has wrongfully withheld a security deposit from suing for amounts due under the lease. 2011 ME 129, ¶¶21-22, 36 A.3d 867, 872-73. In *Mangar,* the tenant was awarded judgment for the full amount of the wrongfully withheld deposit, but the landlord was awarded judgment for the amounts due under the lease, with the amounts ultimately netted.

90. That approach applied here means that the Enos are entitled to damages on Count I of their Complaint in WESDC-CV-14-48 for the full amount of the withheld deposit, plus double damages for the amount wrongfully withheld, plus attorney fees, whereas the

21

Chakravartys are entitled to damages on their counterclaim of $836. The prepaid rent payments applied to December and January rent need not be reflected in the judgment, except for a declaration based on the Chakravartys' counterclaim that they are entitled to keep those payments.

91. The last area meriting discussion is attorney fees. There are two attorney fee provisions applicable here, one from section 14 of the Lease, entitling the prevailing party in litigation arising under the Lease to recover its attorney fees, and the other entitling a tenant to recover attorney fees if the tenant proves that the landlord wrongfully withheld some or all of the tenant's security deposit. *See* 14 M.R.S. § 6034. In WESDC-CV-14-48, each party prevailed in claims arising under the Lease, and the Enos prevailed on the statutory security deposit claim. The amount of the award is based on the entire record as well as on the factors enunciated in *Poussard v. Commercial Credit Plan*, 479 A.2d 881, 884 (Me. 1984).

92. In summary, in the case docketed as WESDC-CV-14-48, the following awards are made on the three-count Complaint and on the Counterclaim:

- on Count I, judgment for the Enos in the amount of $1,200 in the amount of their security deposit, plus double damages totaling $728, plus reasonable attorney fees of $4,000 pursuant to 14 M.R.S. § 6034.

- on Count II, judgment for the Enos for $364, but this is the same $364 included in the double damages awarded on Count I so it is not counted again in the net judgment, plus attorney fees of $1,500 based on section 14 of the Lease.

- on Count III, judgment for the Chakravartys, plus attorney fees of $2,500 pursuant to section 14 of the Lease.

- on the counterclaim, judgment for the Chakravartys for $836, plus attorney fees of $1,500 pursuant to section 14 of the Lease.

These awards, netted against each other ($1,928 + $4,000 + $1,500 - $2,500 - $836 - $1,500), result in an award of $2,592 to the Enos.

93.     In WESDC-CV-14-49, judgment is for the Chakravartys. Although the Chakravartys claim attorney fees in this case pursuant to section 14 of the Lease, no attorney fees are awarded, for two reasons. First, this was a personal injury case that does not involve a dispute under the Lease, at least in the same sense that all of the claims and the counterclaim in WESDC-CV-14-48 do involve. Second, the issues and evidence overlapped almost entirely between the two cases—all of the testimony and exhibits presented in the personal injury case docketed as WESDC-CV-14-49 were also relevant to the claims and counterclaims in WESDC-14-48. Accordingly, the attorney fee awards to the Chakravartys in WESDC-CV-14-48 encompass their entitlement to an award in WESDC-CV-14-49.

94.     As to costs, the Enos were prevailing parties in WESDC-CV-14-48, and the Chakravartys were prevailing parties in WESDC-CV-14-49.

IT IS HEREBY ORDERED AND ADJUDGED AS FOLLOWS:

1.  In WESDC-CV-14-48, judgment for the Plaintiffs for $2,592 in damages and attorney fees, and Plaintiffs are also awarded their costs.

2.  In WESDC-CV-14-49, judgment for Defendants, and Defendants are also awarded their costs.

Pursuant to M.R. Civ. P. 79(a), the clerk is hereby directed to incorporate this Decision and Judgment by reference in the docket.

Dated July 7, 2015

_____
Justice

TODD ENO  - PLAINTIFF
1264 HARPSWELL ISLAND ROAD
HARPSWELL ME 04079
Attorney for: TODD ENO
MICHAEL FELDMAN  - RETAINED
LAW OFFICE OF MICHAEL FELDMAN
14 LINCOLN STREET
BRUNSWICK ME 04011

SUSAN ENO  - PLAINTIFF
1264 HARPSWELL ISLAND RD
HARPSWELL ME 04079
Attorney for: SUSAN ENO
MICHAEL FELDMAN  - RETAINED
LAW OFFICE OF MICHAEL FELDMAN
14 LINCOLN STREET
BRUNSWICK ME 04011

**DOCKET RECORD**

vs
DILIP CHAKRAVARTY  - DEFENDANT
34 NYE LANE
DOVER NH 03820
Attorney for: DILIP CHAKRAVARTY
KRISTINA M KURLANSKI  - RETAINED
RANGER COPELAND MASSEY PA
20 FEDERAL STREET
PO BOX 694
BRUNSWICK ME 04011-0694

MITALI CHAKRAVARTY  - DEFENDANT
34 NYE LANE
DOVER NH 03820
Attorney for: MITALI CHAKRAVARTY
KRISTINA M KURLANSKI  - RETAINED
RANGER COPELAND MASSEY PA
20 FEDERAL STREET
PO BOX 694
BRUNSWICK ME 04011-0694

Filing Document: COMPLAINT                    Minor Case Type: OTHER CIVIL
Filing Date: 03/24/2014

## Docket Events:
03/25/2014 FILING DOCUMENT - COMPLAINT FILED ON 03/24/2014

03/25/2014 Party(s):  TODD ENO
          ATTORNEY - RETAINED ENTERED ON 03/24/2014
          Plaintiff's Attorney: MICHAEL FELDMAN

          Party(s):  SUSAN ENO
          ATTORNEY - RETAINED ENTERED ON 03/24/2014
          Plaintiff's Attorney: MICHAEL FELDMAN

03/25/2014 Party(s):  TODD ENO

TODD ENO - PLAINTIFF
1264 HARPSWELL ISLAND ROAD
HARPSWELL ME 04079
Attorney for: TODD ENO
MICHAEL FELDMAN - RETAINED
LAW OFFICE OF MICHAEL FELDMAN
14 LINCOLN STREET
BRUNSWICK ME 04011

STEPHEN ENO - PLAINTIFF
1264 HARPSWELL ISLAND ROAD
HARPSWELL ME 04079
Attorney for: STEPHEN ENO
MICHAEL FELDMAN - RETAINED
LAW OFFICE OF MICHAEL FELDMAN
14 LINCOLN STREET
BRUNSWICK ME 04011

MICHAEL ENO - PLAINTIFF
1264 HARPSWELL ISLAND RD
HARPSWELL ME 04079
Attorney for: MICHAEL ENO
MICHAEL FELDMAN - RETAINED
LAW OFFICE OF MICHAEL FELDMAN
14 LINCOLN STREET
BRUNSWICK ME 04011

JOSEPH ENO - PLAINTIFF
1264 HARPSWELL ISLAND ROAD
HARPSWELL ME 04079
Attorney for: JOSEPH ENO
MICHAEL FELDMAN - RETAINED
LAW OFFICE OF MICHAEL FELDMAN
14 LINCOLN STREET
BRUNSWICK ME 04011

SUSAN ENO - PLAINTIFF
1264 HARPSWELL ISLAND RD
HARPSWELL ME 04079
Attorney for: SUSAN ENO
MICHAEL FELDMAN - RETAINED
LAW OFFICE OF MICHAEL FELDMAN
14 LINCOLN STREET
BRUNSWICK ME 04011

vs
DILIP CHAKRAVARTY - DEFENDANT
34 NYE LANE
DOVER NH 03820

**DOCKET RECORD**

Printed on: 07/09/2015

Attorney for: DILIP CHAKRAVARTY
KRISTINA M KURLANSKI  - RETAINED
RANGER COPELAND MASSEY PA
20 FEDERAL STREET
PO BOX 694
BRUNSWICK ME 04011-0694


MITALI CHAKRAVARTY  - DEFENDANT
34 NYE LANE
DOVER NH 03820
Attorney for: MITALI CHAKRAVARTY
KRISTINA M KURLANSKI  - RETAINED
RANGER COPELAND MASSEY PA
20 FEDERAL STREET
PO BOX 694
BRUNSWICK ME 04011-0694


Filing Document: COMPLAINT                    Minor Case Type: OTHER PERSONAL INJURY TORT
Filing Date: 03/24/2014

## Docket Events:

03/25/2014 FILING DOCUMENT - COMPLAINT FILED ON 03/24/2014

03/25/2014 Party(s):  TODD ENO
           ATTORNEY - RETAINED ENTERED ON 03/24/2014
           Plaintiff's Attorney: MICHAEL FELDMAN

           Party(s):  STEPHEN ENO
           ATTORNEY - RETAINED ENTERED ON 03/24/2014
           Plaintiff's Attorney: MICHAEL FELDMAN

           Party(s):  MICHAEL ENO
           ATTORNEY - RETAINED ENTERED ON 03/24/2014
           Plaintiff's Attorney: MICHAEL FELDMAN

           Party(s):  JOSEPH ENO
           ATTORNEY - RETAINED ENTERED ON 03/24/2014
           Plaintiff's Attorney: MICHAEL FELDMAN

           Party(s):  SUSAN ENO
           ATTORNEY - RETAINED ENTERED ON 03/24/2014

03/25/2014 Party(s):  SUSAN ENO
           ATTORNEY - RETAINED ENTERED ON 03/24/2014
           Plaintiff's Attorney: MICHAEL FELDMAN

03/25/2014 Party(s):  TODD ENO,STEPHEN ENO,MICHAEL ENO,JOSEPH ENO,SUSAN ENO
           SUMMONS/SERVICE - CIVIL SUMMONS FILED ON 03/24/2014

04/16/2014 Party(s):  DILIP CHAKRAVARTY,MITALI CHAKRAVARTY
           SUMMONS/SERVICE - ACCEPTANCE OF SERVICE SERVED ON 03/25/2014
           Defendant's Attorney: KRISTINA M KURLANSKI